KANSAS CITY, M. & O. RY. CO. OF TEXAS v. POPE et al.†

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 9, 1912. Rehearing Denied Dec. 14, 1912.)

1. COMMERCE (§ 27*) — "INTERSTATE COMMERCE"—WHAT CONSTITUTES—RAILROADS.

A carrier was engaged in interstate commerce at the time of the death of an engineer from a collision occurring after the arrival with his train from another state at the terminus of the railroad in this state while switching certain cars of his train preparatory to placing them in the yards according to orders previously received.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*

For other definitions, see Words and Phrases, vol. 4, pp. 3724–3731.]

2. DEATH (§ 31*)—RIGHT OF ACTION—MASTER AND SERVANT—INTERSTATE COMMERCE.

Under Employer's Liability Act April 22, 1908, c. 149, 35 Stat. 65, as amended by Act April 5, 1910, c. 143, 36 Stat. 291 (U. S. Comp. St. Supp. 1911, p. 1324), which authorizes actions for the death of an employé by his personal representative, and takes precedence over the state statute, which authorizes such actions to be brought by any one or more of the beneficiaries, the widow of an engineer killed by a collision while the defendant carrier was engaged in interstate commerce could not recover

where she sued for herself and as next friend of her minor children.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 35-46; Dec. Dig. § 31.*]

Appeal from District Court, Nolan County; Jas. L. Shepherd, Judge.

Action by Ethel L. Pope and others against the Kansas City, Mexico & Orient Railway Company of Texas. From judgment for plaintiffs, defendant appeals. Reversed and remanded, with directions.

H. S. Garrett, of San Angelo, H. G. McConnell, of Haskell, and Blanks, Collins & Jackson, of San Angelo, for appellant. Hardwicke & Hardwicke, of Abilene, Woodruff & Woodruff, of Sweetwater, and Theodore Mack, of Ft. Worth, for appellees.

SPEER, J. Ethel L. Pope, for herself and as next friend of her three minor children, brought this suit against the Kansas City, Mexico & Orient Railway Company of Texas to recover damages for the death of her husband, Thos. A. Pope, alleged to have been caused by the negligence of the defendant. The defendant interposed special defenses which are not material to the disposition we make of the appeal. The cause was submitted to the jury, resulting in a verdict and judgment in favor of the plaintiff for $10,000 for Mrs. Pope and $5,000 for each of the three minor children. The defendant has appealed.

[1] Upon the trial the following facts were shown: The deceased, Thomas A. Pope, was a locomotive engineer in the employ of the defendant company, and on the day of the accident resulting in his death he brought a train from Altus, Okl., to Sweetwater, Tex., the then terminus of the appellant's line in Texas. In this train were several cars of steel intended for use in the construction of the extension of appellant's line from Sweetwater south, and these cars it seems on the train's arriving at Sweetwater were directed to be set out at appellant's material yard a short distance from the city. The immediate facts surrounding the accident are practically undisputed, and are thus detailed by the witness, H. H. Allen, the conductor of the train on which deceased was engineer, testifying: "We got message from dispatcher to spot those cars in material yard. Do not remember whether this message was received up the line or at the depot at Sweetwater. The material yard is about a mile west of the depot at Sweetwater, Tex. In the train these seven cars were immediately behind the engine. The yards at Sweetwater from the depot down to what is known as the main line switch is downhill. We came into Sweetwater on the regular track. It was necessary for us to clear the main track for the passenger train that was following us. The steel cars were taken out of the train right away. The accident occurred at switch on ice factory track. The ice factory track or switch is eight or ten car lengths from the main line switch. The cars we were to spot were on track No. 1; that is, first track south of main line. I had gone up to the depot to register, and on my return the accident had happened, and I did not see it. When train arrived at Sweetwater, I went at once to office. I had been to the office about 10 minutes when these steel cars were moved. Am not certain where engineer and I got orders to move these steel cars at Sweetwater, but believe it was at Crowell. We came into Sweetwater on main track. When I left the cars to go to register, they were on main line west of main line switch far enough to allow passenger train to get to the depot. Track No. 1 on map is the main line so far as the depot is concerned. We came into Sweetwater on the main line. I believe it runs northeast and southwest. In coming into Sweetwater, you have to back into main track coming into depot. From depot to main track will say is 1,000 feet. There is the ice track running out 300 feet. Then there is track No. 3. Then compress track. Then there is track No. 2, which extends to about 300 feet of depot. I came in from Altus over main line far enough from main line switch to let passenger train come in from Altus. Passenger train backed into depot before I went in. I left my train west of main line switch, and went to depot on passenger train, and while I was gone was while this accident occurred. Passenger train was at depot when accident occurred. When passenger train was set at shop, my train backed in. When I left depot, they were making switch with my train. They had to get the steel cars ahead of the engine and take them out to the material yard, about a mile from the depot. There are a good many ways of getting cars ahead of the engine. They were making a drop of the cars. By that is meant giving the cars a start and cutting the engine off, and allowing it to back in side track and cars roll by. In making this drop switch the cars were on track No. 1 on plat, and the engineer was taking his engine on to track No. 3, or ice factory track. Track No. 1 is 700 or 600 feet long. When I came from the depot engine and cars were about 150 feet west of switch on No. 3. When accident occurred, the engine was backed in on track No. 3 or ice factory, as well as I remember, one of the two, and the cars rolled down and caught the engine before it could get in the clear. The engine was moving when the cars run into it. Engine was moving back; I would say it was moving. I was then, I judge, something like 200 or 300 feet from the engine towards the depot. I was on the engineer's side of the engine. I gave signals, gave danger signals. The signal was a violent stop signal. That indicated danger, and would only be taken to get out of the way.

As to whether it indicated to go forward or backward, in that case it meant to go forward. This signal would be made at nighttime by lantern swung at one-half arm's length, vertically across the track. I was giving that signal. At that time I judge the engine was about the switch. I think it was just about the switch when I gave signal; cannot say whether it was on main line or in switch. When I gave the signal, the steel cars were between me and the engine. After I gave the signal, it was a minute or two until the accident occurred. When the cars run into the engine, the engine was about the ice factory switch. From ice factory switch to track No. 1 is possibly 2 feet, 2 or 2½ feet. From ice factory switch to switch that throws track No. 3 on track No. 1 is about 90 feet. The ground in the yard slopes from depot to the west. I could see Mr. Pope at the time I was giving the danger signal. He had cab light burning, and was standing in cab, running his engine. When I gave the danger signal, I was between the place of the accident and the depot, a little over halfway west from the depot."

Walter F. Anderson, fireman on deceased's engine, testified: "We brought these cars of steel from Altus, Okl. It was one continuous trip from Altus, Okl., back to Sweetwater, Tex., with these cars. I was firing the engine for Engineer Pope when he met his death. He made a trip from Sweetwater to Altus the day before his death, returning from Altus the day he met his death. Mr. Pope came into Sweetwater about 20 or 25 minutes before his death. . After coming into Sweetwater, it was the duty of Mr. Pope to switch cars, put our train away, and do all necessary switching."

It is undisputed that at the time the deceased met his death he was switching the steel cars which he had brought down from Altus, Okl., to Sweetwater, preparatory to placing the cars in the yards according to orders previously received. He was making what is known in railroad parlance as a "Dutch drop" with the cars of steel when they collided with his engine, resulting in the injuries from which he died. Under these facts, we think the trial court should have instructed a verdict for the defendant.

[2] Act Cong. April 22, 1908, c. 149, 35 Stat. 65, as amended by Act April 5, 1910, c. 143, 36 Stat. 291 (U. S. Comp. St. Supp. 1911, p. 1324), known as the "Employer's Liability Act," provides that "every common carrier by railroad while engaged in commerce between any of the several states or territories * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or in the case of the death of such employé to his or her personal representative for the benefit of the surviving widow or husband and children of such employé, and if none, then of such employé's parents, and if none, then of the next of kin dependent upon such employé, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employés, of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, road bed, works, boats, wharves, or other equipment." It is well known that, independently of statute, no cause of action for injury resulting in death arises in this country. It is equally well settled on the highest authority that, where a state statute conflicts with an act of Congress, the latter will prevail as the supreme law of the land. Now a comparison of the federal Employer's Liability Act with our state statute on this subject discloses a material conflict in this: That the state statute expressly authorizes any one or more of the beneficiaries under the act to maintain the suit, whereas, the federal act contains no such provisions. By that act no one in express terms is authorized to bring the suit, but the cause of action is given to the personal representative. No one else, therefore, can show a right to recover under the statute. It is not a mere question of capacity of parties, requiring a plea in limine, but is rather a question of liability at all. The recent case of G., C. & S. F. Ry. Co. v. Lester, 149 S. W. 841, by the Court of Civil Appeals for the Third District, presents a very satisfactory discussion of this subject, and is conclusive, as we understand its holding, as against the right of appellee to maintain this suit. The reasoning of that opinion commends itself to us and on that authority, as well as reason, we sustained appellant's assignment that a verdict should have been instructed in its favor, and reversed the judgment and remanded the cause, with instructions to the trial court, if the evidence should be the same on another trial, to instruct a verdict for defendant.

Reversed and remanded, with instructions.